IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| JONATHAN RANGEL, *individually and on behalf of all other similarly situated persons*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:25-cv-01288 (AJT/LRV) |
| DMV PROTECTION, LLC, *et al.*, | ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION AND ORDER

In this "hybrid" wage theft and misclassification action, Plaintiff Jonathan Rangel brings collective action claims under the Fair Labor Standards Act (FLSA) and putative class action claims under the wage and hour laws of multiple states[1] and the Virginia misclassification of workers statute § 40.1-28.7:7. Plaintiff contends that Defendant DMV Protection, LLC ("DMV"), which provides its clients with security personnel, and its owner, Defendant Jovan Vladic, misclassified DMV's security officers as independent contractors rather than employees and, as a result, failed to pay them proper overtime premiums and certain wages as required by the above statutes. By order dated March 26, 2026, the Court conditionally certified an FLSA collective class and certified a Rule 23 class defined as "[a]ll current and former DMV security guards who worked over 40 hours in any workweek since August 4, 2022." [Doc. No. 117]. Before the Court are Plaintiffs' Motion for Partial Summary Judgment on the issues of misclassification and Defendant Vladic's individual liability, [Doc. No. 156], and Defendants'

[1] Plaintiff sues under "the state laws of Virginia, Maryland, the District of Columbia, and any other state where there are sufficient current and former DMV Protection workers to certify a class." [Compl.] ¶ 1. For an exhaustive list of the relevant statutes, see Note 5, *infra*. The parties do not dispute that DMV operates in Virginia, the District of Columbia, and Maryland; no other states have been proffered. [Opp] at 6 ¶ 1; [Doc. No. 91] ¶¶ 32-33.

Motion for Decertification, [Doc. No. 159], which seeks decertification of both classes (collectively, "the Motions"). Upon review of the Motions, the memoranda in support thereof and opposition thereto [Doc. Nos. 157, 160, 162, 163, 168, 169], the entire record of this action, and for the reasons that follow, the Court hereby **GRANTS** Plaintiffs' Motion and **DENIES** Defendants' Motion.

## I. BACKGROUND

A. Factual Background

The following facts are undisputed unless indicated otherwise:

i) *DMV's Business, Personnel, and Clients*

DMV is a security service company owned and operated by Defendant Vladic. [Doc. No. 91] ¶ 27; [Doc. No. 120] ¶ 27. DMV provides security personnel to secure its clients' facilities and events in Virginia and the District of Columbia (D.C.), as well as one contract in Maryland. [Opp] at 6 ¶ 1; [Doc. No. 91] ¶¶ 32–33. This is its sole business purpose. [Doc. No. 157-8] at 29. DMV's managerial team includes Defendant Vladic, a Director of Operations, and up to three supervisors. [Doc. No. 157-8] at 31. During the relevant period, DMV has provided security guards for approximately 92 clients in Virginia, Maryland, and D.C.[2] [Doc. No. 157-2] ¶ 10.

At Vladic's direction, DMV classifies everyone on its payroll (not including Vladic) as independent contractors, from guards up to the Director of Operations. [Doc. No. 91] ¶ 35; [Doc. No. 120] ¶ 35; [Doc. No. 157-8] at 37, 40–42. Upon hiring, DMV requires its guards to sign a functionally identical "Independent Contractor Agreement" ("ICA;" [Doc. No. 157-14]) and an "Independent Contractor Handbook" ("ICH;" [Doc. No. 157-15]), both authored by Vladic, which memorialize the policies to which all DMV guards are subject. These documents are DMV's sole

[2] DMV's work in Maryland was limited to a single client site with fewer than ten officers staffed there. [Doc. No. 162] at 6; [Doc. No. 162-1] at 51.

written company policy documents. [Doc. No. 91] ¶ 35; [Doc. No. 120] ¶ 35; [Doc. No. 157-8] at 83, 85–86, 92–94, 152–53.

ii) *Other Mechanics Associated with the Guards' Classification*

Despite being classified as independent contractors, the guards cannot hire their own employees, subcontract their shifts to another subcontractor, grow their operation or income except by being promoted or assigned to a higher-paying site, or even arrange for a coworker to cover their shift without supervisor approval. [Doc. No. 157-8] at 95–100, 171–72; [Doc. No. 157-12] at 80–81. To prevent conflicts of interest, the ICA requires security guards to provide notice and receive permission from DMV if they want to work for other security companies. [Doc. No. 157-14] ¶ 7; *see also* [Doc. No. 157-8] at 121–23. However, guards were free to maintain outside employment simultaneously with their work for DMV, including for other security companies, and many did so. [Doc. No. 162-1] at 14, 72; [Doc. No. 162-7] at 16–17. Guards were contracted for one year, then month-to-month indefinitely ([Doc. No. 157-8] at 132), and although the guards did not generally view it as a temporary job, the turnover rates were fairly high: the class members' durations of employment ranged from under one month to over three years, with an average duration of 36.7 weeks. [Doc. No. 162-4] at 8; [Doc. No. 157] at 21 ¶ 82; [Doc. No. 157-2] ¶ 6. Several guards were promoted to supervisory roles during their time with DMV. [Doc. No. 162-2] at 32; [Doc. No. 162-6] at 20–21.

DMV imposes several requirements before a guard is hired: they must be at least eighteen years of age (twenty-one for armed guards), have a high school degree or equivalent, and obtain a security guard license within ninety days of hiring. [Doc. No. 157-8] at 72–76. DMV pays its guards on an hourly basis (with no overtime premium), from approximately $16.50 to $22.00 per hour, which is set by DMV based on the client's rate of pay, and the record reflects no input or

negotiation by the guards on these rates. [Doc. No. 91] ¶¶ 47-48; [Doc. No. 157-8] at 66–67; [Doc. No. 157-9] at 8; [Doc. No. 157-18]; [Doc. No. 162-1] at 48. Defendant Vladic makes all decisions regarding hiring, firing, and rate of pay. [Doc. No. 157-8] at 107–08; [Doc. No. 120] ¶ 41. DMV does not require its guards to make any up-front investment regarding their work or to provide any job-related equipment whatsoever, and it provides the guards with, *inter alia*, DMV-branded uniforms (which may vary by site, and which the guards must return upon leaving DMV),[3] radios, counters, badges, keys, vehicles, and gas, [Doc. No. 157-12] at 67–68, 83, 98, 123–25, 161; [Doc. No. 157-28]; [Doc. No. 162-2] at 38.

iii) *The Guards' Duties and Supervision*

Subject to minor site-specific differences (e.g., some sites required vehicle patrols while others did not, *see* [Doc. No. 162-1] at 56–57), all DMV security guards perform essentially the same duties, which include: monitoring the premises to prevent theft, violence, vandalism, or infractions of rules; reporting facility issues such as fire hazards and leaking water pipes; and requesting emergency personnel for high-risk situations. [Doc. No. 157-8] at 68; [Doc. No. 157-10] at 44–48; [Doc. No. 157-17].

DMV coordinates almost all scheduling between the client and the guards,[4] typically by matching a guard with a client (or small set of clients) based on their respective availability at the time of the guard's initial interview and then determining a regular schedule of shifts for the guard to work (or, if the client's scheduling needs are irregular or shifts are left vacant, offering shifts to one or more guards on an a-la-carte basis). [Doc. No. 162-1] at 44; [Doc. No. 162-2] at 32. However, DMV's Director of Operations retains the right to remove or reassign a guard if the

[3] Guards may need to buy specific clothing items to adhere to DMV's uniform requirements. *See, e.g.* [Doc. No. 157-6] ¶ 7.

[4] Specifically, for all but two of DMV's 92 clients, DMV communicates a guard's schedule to them through an application called Novagems, which is managed by DMV. [Doc. No. 157-15] at 47–49, 144.

client is dissatisfied with their performance. [Doc. No. 162-1] at 159. Each client, through DMV and its Novagems application, provides site instructions to the security guards; DMV considers the site instructions to be part of its rules and regulations for guards. [Doc. No. 157-8] at 100–03, 124, 213; [Doc. No. 157-25]; [Doc. No. 162-6] at 23.

Guards are required to notify DMV of anticipated late arrivals, early departures, and time-off requests—which requests DMV requires to be submitted two weeks in advance—and to conduct periodic check-ins during their shift, all through Novagems. [Doc. No. 91] ¶¶ 40, 53; [Doc. No. 157-8] at 100–01, 125, 144, 152; [Doc. No. 157-12] at 86–87; [Doc. No. 157-15] at 3–4; [Doc. No. 157-22]. Specifically, all guards are required under the ICH to clock in and out via Novagems regardless of client site, and some sites also require them to submit additional reports, known as Daily Activity Reports ("DAR"), which may include requirements such as submitting photographs or scanning QR codes to confirm that the guard had inspected certain areas. [Doc. No. 157-10] at 60–61; [Doc. No. 157-15] at 3–4; [Doc. No. 24].

DMV also imposes various regulations on guards' performance and onsite conduct, penalizing them for, *inter alia*, late arrivals or early departures, failing to wear the DMV-branded uniform, smoking, using their phone for non-work purposes, or disclosing to clients or certain other third parties DMV's "confidential information," which DMV defines as shifts, schedules, payments, pay rates, work opportunities, operational details, and DMV-related events. *See generally*, [Doc. No. 157-15]; *see also* [Doc. No. 157-8] at 138, 141–44. The DMV and site-specific policies are enforced by DMV supervisors through both regular and unannounced in-person site visits as well as electronic supervision through the Novagems app (including GPS location tracking), and may result in penalties including docking of pay, suspension, and

termination. *Id*. at 106–07, 143–44, 173–74, 179; [Doc. No. 157-6] ¶¶ 9-10; [Doc. No. 157-10] at 60–62, 67–68, 76; [Doc. No. 157-11] at 3; [Doc. Nos. 157-15, 157-21, 157-27].

B. Procedural History

Plaintiff filed his Complaint on August 4, 2025, bringing collective action claims under the FLSA and putative class action claims under the wage and hour laws of multiple states.[5] Seven opt-in Plaintiffs joined the action prior to the Court's conditional certification of the collective. ([Doc. Nos. 47, 51, 52, 76, 105, 116]). Defendants filed a motion to dismiss for failure to state a claim, which the Court denied. [Doc. Nos. 11, 80]. Plaintiffs then moved for conditional certification of an FLSA collective and certification of a Rule 23 class, [Doc. No. 73], and after a hearing on that motion, the Court granted both requests and authorized a sixty-day notice and opt-in period. [Doc. Nos. 96, 117]. As Plaintiffs represent in their briefs, notice went out to 188 putative class members, sixty-three of whom opted in prior to the end of the notice period, thus bringing the total number FLSA collective class members to sixty-four.[6] [Doc. No. 157] at 8.

[5] The full list of statutes under which Plaintiffs purported to state a claim are:

a) The Virginia Overtime Wage Act ("VOWA"), Va. Code § 40.1-29.2; and Virginia Wage Payment Act ("VWPA"), Va. Code § 40.1-29, and; Virginia's statute prohibiting misclassification of workers, Va. Code § 40.1-28.7:7; b.
b) Maryland's Overtime statute, Md. Labor and Employment Code Ann. § 3-420; Maryland's Payment of Overtime statute, Md. Labor and Employment Code Ann. § 3-415; Maryland's statute providing for action against employer by or for employee, Md. Labor and Employment Code Ann. § 3-427, and; Maryland's statutory provisions prohibiting unauthorized deductions from wages, Md. Labor and Employment Code Ann. § 3-503 and § 3-507.2; c.
c) The District of Columbia Minimum Wage Revision Act, D.C. Code §§ 32-1003, 32-1012 and District of Columbia Payment and Collection of Wages law, D.C. Code §§ 32 1302, 32-1308.
d) The state wage and hour laws of any other applicable states.

[Compl.] ¶ 3.

[6] Without a citation to a valid docket entry or other evidence, Defendants contend that, at least initially, Plaintiffs identified 192 putative collective members, *see* [Doc. No. 160] at 12, a discrepancy that neither party addresses in its briefs. For purposes of this Memorandum Opinion only, the Court will regard the putatitve class as comprised of 188 members.

Plaintiffs filed their Motion for Partial Summary Judgment on August 6, 2026, [Doc. No. 156], and Defendants filed their Motion to Decertify both classes the following day. [Doc. No. 159]. Both Motions became fully briefed on September 3, 2026.

## II. STANDARD OF REVIEW

A. Motions for Summary Judgment

The standard for granting summary judgment is satisfied if, after a review of the record, a court finds that there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). There are no material facts in dispute "unless there is sufficient evidence favoring the nonmoving party." *Id.* at 249. The sufficiency of the nonmoving party's evidence is evaluated by whether a reasonable juror could find in their favor by a preponderance of the evidence; thus, "the mere existence of a scintilla of evidence in support of the [party's] position will be insufficient." *Id*. at 252. And while the Court must resolve conflicting inferences from circumstantial evidence in favor of the nonmoving party, the review standard does not allow for the "distort[ion] of the plain meaning of words or conveniently to read[ing] them out of context." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 821–22 (4th Cir. 1995).

B. Motions for Decertification

i) *Decertification of the FLSA Collective*

Pursuant to the FLSA, an employee may bring an action against their employer "on behalf of himself or themselves and other employees similarly situated," but any similarly situated employees must consent to it in writing. 29 U.S.C. § 216(b). FLSA collective actions are intended to resolve common issues of law and fact in one proceeding and lower the individual costs of vindicating rights. *See Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

FLSA collective actions typically follow a two-step certification framework, known as the *Lusardi* framework, whereby the plaintiff first moves for conditional certification pending a subsequent, more final determination on certification (which is often precipitated by the defendant's motion to decertify collective). *See Lusardi v. Xerox Corp.*, 99 F.R.D. 89 (D.N.J. 1983). At either step, the plaintiff has the burden of demonstrating that the proposed members of the collective are similarly situated, but the standard varies between the two steps. *Purdham v. Fairfax Cnty. Pub. Schs.,* 629 F. Supp. 2d 544, 548 (E.D. Va. 2009). At the first step (the "notice" step), the plaintiff "need only make a modest factual showing . . . that they and potential [collective action members] together were victims of a common policy or plan that violated the law." *Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 564 (E.D. Va. 2006).

Under the second step, courts apply a more rigorous, merits-based analysis to determine whether the plaintiffs are indeed similarly situated. Though the FLSA does not define "similarly situated," the relevant inquiry has been described as follows:

> [C]ourts have determined if potential class members are similarly situated by assessing the existence of issues common to the proposed class that are central to the disposition of the FLSA claims and that such common issues can be substantially adjudicated without consideration of facts unique or particularized as to each class member. The situations need not be identical . . . [and] [i]nsubstantial differences in job duties, hours worked and wages due that do not materially affect whether a group of employees may be properly classified are not significant to the "similarly situated" determination.

*LaFleur v. Dollar Tree Stores, Inc.*, 30 F. Supp. 3d 463, 468 (E.D. Va. 2014) (quoting *Houston et al. v. URS Corp. et al.*, 591 F. Supp. 2d 827, 831 (E.D. Va. 2008)) (cleaned up). Despite the evidentiary rigor involved at this step, whether to decertify an FLSA collective is within the district court's "broad discretion." *Randolph v. PowerComm Constr., Inc.,* 309 F.R.D. 349, 368 (D. Md. Aug. 21, 2015).

Courts typically consider three factors to aid in their analysis at the second *Lusardi* step, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Hunter v. LaserShip, Inc.,* No. 1:24-CV-02345-AJT-IDD, 2025 WL 1399195, at *3 n.6 (E.D. Va. May 14, 2025) (quoting *Curtis v. Time Warner Ent.-Advance/Newhouse P'ship*, No. 3:12cv2370, 2013 WL 1874848, at *3 (D.S.C. May 3, 2013)). If, after reviewing these considerations, the court determines that the collective plaintiffs remain "similarly situated," then the collective action is certified; if they are not, the collective action is decertified. *Choimbol,* 475 F. Supp. 2d at 563.

ii) *Motions to Decertify a Rule 23 Class*

Federal Rule of Civil Procedure 23(a) provides in pertinent part that

> [o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b) further provides that a class action may be maintained if the above prerequisites are satisfied and if

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b). And while "[q]uestions regarding the certification of a class action are left to the sound discretion of the district court[,] . . . an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate." *Stott v. Haworth,* 916 F.2d 134, 139 (4th Cir.1990) (internal citations omitted).

## III. DISCUSSION

A. Neither FLSA Decertification nor Rule 23 Decertification is Proper

i) *FLSA Decertification*

Defendants contend that the FLSA collective should be decertified because the putative collective members are not clearly identified or similarly situated and because allowing the case to proceed as a collective action would be procedurally cumbersome and unfair to Defendants. With regard to the first issue, Defendants contend that although DMV produced in discovery records which indicate a precise number of 188 guards who were paid for over forty hours in one or more workweek since August 4, 2022, (which aligns with the class definition), the class is ill-defined because there is no way to confirm that each of these plaintiffs actually worked more than forty hours in those weeks. [Doc. No. 160] at 12–13. Defendants highlight that "[t]he individuals with weekly time noted just over 41 hours is too numerous to list," such that the risk of overinclusion is high. *Id*. at 13.

The class definition is precise and based on DMV's detailed payroll records, with no evidence of widespread error or incomplete records. Furthermore, the record is replete with information on DMV's sophisticated hours-tracking system which uses app-based clock-ins, clock-out functions, and GPS tracking to ensure the guards' presence on the site during the hours they claim to have worked. [Doc. No. 157-8] at 184–87; [Doc. No. 157-12] at 65; [Doc. No. 157-

10] at 67; [Doc. No. 157-23]. Therefore, the class definition does not support decertification as Defendants contend.

Defendants next contend that the putative collective members are not similarly situated. Specifically, they argue that differences in certain factors, such as the guards' wages, hours, duties, and duration of work for DMV, render collective recovery impractical and inappropriate. Defendants relatedly contend that they have "defenses individual to each putative collective member," referring only to the duration of work issue discussed above. [Doc. No. 160] at 15.

The facts relevant to both of these issues are identical in substance to those material to Plaintiff's Motion for Summary Judgment on the issue of misclassification, and the parties' arguments here also closely parallel those raised under that Motion; both center on the "economic realities" of the security guards' work vis-à-vis one another and the Defendants. *See United States v. Silk*, 331 U.S. 704 (1947). The Court incorporates that discussion in Section III.B, *infra*, by reference, but by way of summary, the relied upon differences among guards with respect to each of the *Silk* test factors are minimal, including those pertaining to the terms and conditions of the guards' employment and their relationship with Defendants. For instance, the guards' wages ranged only between $16 and $22 per hour, [Doc. No. 91] ¶¶ 47-48; [Doc. No. 157-8] at 66–67; [Doc. No. 157-9] at 8; [Doc. No. 157-18]; the client-driven differences in duties and conduct requirements were likewise minimal (*e.g.*, some sites required vehicle patrols while others did not, and some required guards to wear suits while others merely a polo shirt, *see* [Doc. No. 162-1] at 56–57, 68; and as Defendants themselves point out, *supra*, the guards' average number of weekly hours clustered so closely around forty that "[t]he individuals with weekly time noted just over 41 hours is too numerous to list." [Doc. No. 160] at 13. The largest difference among guards appears to be the duration of employment, which ranges among collective members from approximately

one month to over three years. Nevertheless, the guards' contracts all began with the same (officially indefinite) term, and permanency is only one of six factors, none of which are dispositive under the *Silk* analysis. *See LaFleur,* 30 F. Supp. 3d at 470 ("While actual hours worked and wages due may vary within the collective, district courts in the Fourth Circuit have clarified that '[d]ifferences as to time actually worked, wages actually due and hours involved' do not preclude a finding of a 'similarly situated' class.") (quoting *Romero v. Mountaire Farms, Inc.,* 796 F. Supp. 2d 700, 705 (E.D.N.C. 2011)).

Lastly, Defendants argue that "[f]airness and procedural considerations favor decertification [because] [t]rial would require individualized mini-trials to first determine if that individual plaintiff was actually a member of the intended class." [Doc. No. 160] at 16. They contend that the risk of jury confusion, the inability to provide coherent instructions applicable to all members, and the likelihood of inconsistent verdicts all counsel against collective or class treatment. *Id*. (citing *Abe v. Va. Dep't of Envtl. Quality*, No. 3:20-cv-270, 2021 U.S. Dist. LEXIS 92440, at *10 (E.D. Va. Apr. 5, 2021)). The "fairness and procedural considerations factor" requires the Court to evaluate the primary objectives of a FLSA collective action: (1) to lower the costs to plaintiffs through the pooling of resources and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity. *LaFleur*, 30 F. Supp. 3d at 475. Defendants' argument on this point essentially relies on the same purported differences discussed above and in Section III.B *infra*. But these differences are, again, relatively minor, and the mere existence of some factual differences among FLSA collective members does not render this form of action unfair or procedurally inefficient as Defendants contend. To the contrary, given the large number of collective members and the degree to which central issues (such as the independent contractor designation and non-receipt of overtime

payment) are identical across Plaintiffs notwithstanding their different durations of employment, this case is precisely the type of situation for which FLSA collective actions were intended. *See Clinton v. Gov't Emples. Ins. Co.*, 2:16-cv-430, 2018 U.S. Dist. LEXIS 116647, at *11 (E.D. Va. July 2, 2018) ("In the event of decertification, the cost of individual trials would be significant for Plaintiffs, as well as for [defendant]. Decertification would not promote judicial efficiency because individual trials would be redundant, and many of the same claims, evidence, and defenses would be litigated."). The record evidence also clearly supports Plaintiffs' claim that they can use common evidence (chiefly, DMV's extensive payroll data) and representative testimony to prove their claims on a collective basis.

Accordingly, the Court denies Defendants' request to decertify the FLSA collective.

ii) *Rule 23 Decertification*

A proposed Rule 23 class must satisfy all four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and at least one subsection of Rule 23(b). As relevant here, under Rule 23(b)(3), plaintiffs must additionally establish that questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Plaintiffs continuously have the burden to support certification, and "[an] order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate." *Stott,* 916 F.2d at 139 (internal citations omitted).

Defendants contend that the Rule 23 class should be decertified because individual issues predominate over common questions (in other words, that the members of the putative class are not "similarly situated"), and relatedly that a class action is not superior to other available methods

under Rule 23(b)(3). [Doc. No. 160] at 18–19, 24. Their arguments on both these points effectively repeat those raised in support of FLSA decertification and fail for the same reasons discussed in the preceding section (generally, that the class members' terms and conditions of work were not materially different from one guard to another, and the record does not suggest that individual trials would be more fair or efficient).

Defendants also rely on certain arguments from their opposition to Plaintiffs' Motion for Rule 23 Certification, [Doc. No. 90], chiefly that in the three jurisdictions in which the class members worked, "significant differences exist in the available remedies, the calculation of damages, and the threshold standards of proof for overtime wage violations." [Doc. No. 160] at 19. Specifically, Defendants note that the three jurisdictions' amounts and procedures for recovery of liquidated and other non-compensatory damages are distinct; that Washington D.C.'s wage law allows for recovery of attorneys' fees while Virginia's and Maryland's do not; and that D.C. law does not provide a statutory safe harbor or good-faith defense while Virginia law does (and Maryland law contains a similar-but-distinct "good faith dispute" provision). *Id.* at 19–24. However, these issues, with the possible exception of the safe harbor and good faith dispute issues, do not relate to Plaintiffs' right to recover on their wage and hour claims under those statutes[7] but are the kind of issues commonly addressed by district courts in post-trial briefing. And the safe harbor and good faith dispute issues either are not implicated in Plaintiffs' claims or constitute issues that do not threaten to so complicate, multiply proceedings, or prejudice either party as to make the class action proceeding impractical or unfair. *See, e.g., Langan v. Johnson & Johnson*

[7] For instance, even if the *amount* of additional damages differs across the relevant statutes, the applicable standards for when such damages may be awarded are nearly identical across those statutes. *Compare* Md. Code Ann., Lab. & Empl. § 3-427(d)(2) *with* Va. Code Ann. § 40.1-29.3.

*Consumer Cos.*, 897 F.3d 88, 97 (2d Cir. 2018) ("Variations in state laws do not necessarily prevent a class from satisfying the predominance requirement . . . .").

For these reasons, Defendants have likewise failed to adequately establish that the Court should decertify the Rule 23 class in this action, and their Motion for Decertification, [Doc. No. 117], is denied in its entirety.

B. Plaintiffs Are Entitled to Summary Judgment on Misclassification

Plaintiffs seek summary judgment that DMV misclassified its security guards as independent contractors rather than employees. For purposes of Plaintiffs' Motion, the analyses and standards of proof related to worker classification are identical, as each of the relevant state statues impose liability coextensively with the FLSA. Va. Code Ann. § 40.1-29.2 (2026); D.C. Code § 32-1301 (2017); *McFeeley v. Jackson Street Entertainment, LLC*, 825 F.3d 235, 240–41 (FLSA and Maryland Wage & Hour laws coextensive).

Plaintiffs' status as independent contractors or employees (and thus the merits of their misclassification claims) are determined under the "economic realities" test established by the Supreme Court in *Silk*. 331 U.S. at 713. The Fourth Circuit has recognized six factors based on *Silk*, none of which are individually dispositive, that bear on whether the parties' relationship is that of an employee or an independent contractor:

> (1) the degree of control the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Schultz v. Capital Int'l Sec.*, 466 F.3d 298, 304–05 (4th Cir. 2006).

Plaintiffs contend that the undisputed facts with respect to all six *Silk* factors point in favor of an employee relationship. Defendants purport to dispute that any of those six factors favor an

employee relationship but only address three of them: (1) control over performance; (2) opportunity for profit and loss, and (5) permanence of the relationship.[8]

With respect to control over performance, Plaintiffs contend that the undisputed facts show that DMV exercises significant control over the manner in which its guards provide security services. They point to DMV's extensive policies and requirements pertaining to uniform violations, timing and routes of patrols, etc., its control over scheduling and supervision of guards using the Novagems app and in-person site visits, and the discipline it imposes for violations of its policies, all of which courts have found support an employment relationship under the *Silk* test. *See, e.g.*, *Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 750 (security company that imposed dress code, monitored for policy violations, and required shift reports was employer); *see also Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 666 (7th Cir. 2022) (control over truck driver operational standards, minutiae of how driver worked, personal appearance, and demeanor supports employee status).

Defendants contend that their guards have significant discretion over the manner in which they provide services, and in that regard, theycontend that DMV does not control a guard's schedule because shifts are simply offered to a guard and they are free to refuse. But that contention is inconsistent with the record, which shows that once a guard has been matched with a worksite, they often assume a regular schedule which DMV enforces through its pay docking and time off request systems, and while shifts are occasionally offered a-la-carte, that is not typical or a matter of course. [Doc. No. 162-1] at 44; [Doc. No. 162-2] at 32. But even if Defendants' contention could be accepted through a view of the evidence most favorable to DMV, Courts have rejected

[8] Defendants also argue that they are entitled to statutory immunity for the various alleged wage and hour violations under 29 U.S.C. § 259 due to a 2022 Department of Labor investigation of DMV which found no labor law violations, a contention that the Court addresses in Section III.B.i, *infra.*

it. *See Chavez-Deremer v. Med. Staffing of Am., LLC,* 147 F.4th 371, 402 (4th Cir. 2025) (where workers select which shifts to work, but putative employer controls which shifts are available to workers, the employer controls workers' schedules).

DMV also argues that in various respects, the control being exercised over their guards' performance is being exercised solely by DMV's clients rather than DMV itself. [Doc. No. 162] at 14–15. They point to client-driven differences in the DMV-enforced requirements with regard to the guards' attire, the means of patrolling the site, etc., and they assert that, for instance, when DMV docks a guard's pay for late arrivals or other conduct violations, it is merely "passing through" the client's refusal to pay to the guard. This "client control" argument is factually unfounded[9] and has been rejected by courts based on similar facts. *See, e.g., Solis,* 819 F. Supp. 2d at 750–51 ("[The defendant] directly monitored the Guards to ensure that they met the needs of a particular client and in this way [the defendant] exclusively held power over the Guards. As such, the 'control' factor supports classifying the Guards as employees.").

Lastly, Defendants contend that any control DMV may have exercised was simply the typical, appropriate degree of quality control over the services it provides to its clients via its contract guards, which would inhere in any contractual or subcontractual relationship. However, this aspect of a relationship can exist in any employment relationship, however characterized, and cannot transform an otherwise employee relationship into an independent contractor relationship, particularly in this case, where DMV's supervision gores beyond the ordinary quality control that a services contractor would exercise over its subcontractor. For example, for many worksites

[9] For instance, DMV in support of its pay-docking policy relies exclusively on a brief, general, and self-serving statement of Defendant Vladic in his deposition, [Doc. No. 162-5] at 113, without any other evidence showing that any single instance of pay-docking was done at the client's initiation or in response to a client's withholding of pay. Plaintiffs, by contrast, cite numerous emails which show DMV expressly exercising its own independent discretion over pay-docking decisions. *See, e.g.* [Doc. No. 157-21] at 14, 32–34. In any event, even without this aspect of control, the undisputed facts support an employee relationship under the *Silk* control factor.

DMV's policies dictate a guard's precise physical movements through the site while on patrol and even go so far as to ban guards from sitting or leaning on walls. [Doc. No. 157-8] at 138; [Doc. No. 157-15].

In sum, the undisputed facts show that there are hardly any aspects of a guard's performance over which DMV *does not* exercise control. Accordingly, the first factor clearly weighs in favor of Plaintiffs.

Plaintiffs next argue that the second *Silk* factor supports employment because the guards' opportunities for profit and loss are minimal, consistent with low-skilled wage work, relying on multiple FLSA cases in the security guard context which held that where guards are paid a set rate for each shift, and the schedule of the client dictates the number of shifts available and hours worked, the guards did not have opportunities for profit or loss. *See Solis,* 819 F.Supp.2d at 751 (where guards were paid hourly, they "had no opportunity, by performing their tasks efficiently and skillfully, to earn additional profit, nor did they have a share in [the company's] overall profits or losses.").

On this factor, Defendants argue simply that because pay varied across sites and raises or promotions were possible, there is a material issue of fact as to the existence of profit or loss opportunities. However, the record evidence shows that guards' wages ranged only from $16 to $22 per hour, which is minimal. [Doc. No. 91] ¶¶ 47-48; [Doc. No. 157-8] at 66–67; [Doc. No. 157-9] at 8; [Doc. No. 157-18]. And with respect to the opportunities for promotion, Defendants have identified only two guards out of the 188 class members who were promoted to supervisory roles, and do not specify what change in income resulted from those promotions. [Doc. No. 162-2] at 32; [Doc. No. 162-6] at 20–21. They also do not identify any instances of performance-based raises absent a worksite reassignment. Lastly, except for the two promotions, Defendants did not

show that any purported profit opportunities depended on a guard's managerial skills; to the contrary, their primary relied-upon means to earn more money (changing to a higher-paying site) appears to depend chiefly on whether those sites happened to be fully staffed at a given time, and Defendants do not contend that high-performing employees are routinely reassigned to higher-paying sites as a form of promotion. Based on this record, the undisputed facts show there is little, if any, significant opportunity for profit and loss, and the second *Silk* factor therefore weighs in favor of an employment relationship. See, e.g. *Hall v. DIRECTV, LLC*, 846 F.3d 757, 774 (4th Cir. 2017) (finding that the third *Silk* factor supported employment status where workers "could not increase their take-home pay through their own ingenuity or skill").

The fifth *Silk* factor concerns the permanency of the parties' relationship, including whether a term limit has been set and whether the work is "the kind of itinerant work that independent contractors ordinarily performed." *Chaves-Deremer*, 147 F.4th at 408. This factor "weighs in favor of the worker being an employee when the work relationship is indefinite in duration, continuous, or exclusive of work for other employers." 29 C.F.R. § 795.110(3). While the average duration of a worker is central to this analysis, there is no bright-line rule and a short duration does not necessarily support a contractor relationship, especially where "short employment periods were due to a high turnover rate and not due to the [workers] being in business for themselves." *See Randolph*, 309 F.R.D. at 359.

The relevant facts as to duration are clear-cut, and both parties point to them: The record shows that DMV as a matter of course offered guards one-year contracts that could be extended month-to-month indefinitely. [Doc. No. 157-8] at 132. The guards' tenures ranged from under one month to over three years, with an average of 8.5 months or about 37 weeks (thirty-nine class members worked for DMV for more than a year). [Doc. No. 162-4] at 8; [Doc. No. 157] at 21 ¶

82; [Doc. No. 157-2] ¶ 6. However, courts have consistently found an employee relationship based on similar metrics. *See, e.g. Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) (finding 'permanency' factor supported employee status even though workers only worked for two months). Regarding the ability to engage in other employment, the record is clear that many guards did have outside employment and that DMV generally allowed that. [Doc. No. 162-1] at 14, 72; [Doc. No. 162-7] at 16–17. However, the guards worked for DMV on average 42 hours per week which is consistent with a full-time job, [Doc. No. 157-2] ¶ 8, and overall, a worker's mere ability to maintain outside employment, without more, is inherently less probative as to the nature of the relationship than some of the other *Silk* factors that clearly weigh in Plaintiffs' favor.

For the above reasons, the Court concludes that based on the undisputed facts pertaining to the *Silk* factors, Plaintiffs were employees rather than independent contractors and are entitled to judgment as a matter of law on their claim that Defendants misclassified their security guards.

i) *Defendants' Statutory Immunity Defense Was Waived and Is Also Not Applicable*

Defendants contend that Plaintiffs' claims are pre-empted, and summary judgment on their misclassification claim is barred, regardless of the record, because in December of 2022, the Department of Labor ("DOL") investigated DMV and issued a written opinion finding no violations of labor laws, including with respect to employee classification, [Doc. No. 162-3], and that they have reasonably relied on that finding and are therefore statutorily immune under 29 U.S.C. § 259.

Section 259 provides that "no employer shall be subject to any liability or punishment" for alleged FLSA minimum-wage or overtime violations if the employer "pleads and proves" that the challenged act or omission was "in good faith in conformity with and in reliance on" a written

administrative "regulation, order, ruling, approval, or interpretation" of the Department of Labor's Wage and Hour Division. 29 U.S.C. § 259. In other words, this statute operates as an affirmative defense against an admitted FLSA violation. *Green v. Humana at Home, Inc.,* 380 F. Supp. 3d 400, 411 (S.D.N.Y. 2019). Inexplicably, Defendants' opposition to Plaintiffs' Motion for Partial Summary Judgment, [Doc. No. 162] at 10–13, is the first time this issue has been raised.

Defendants' contention that Plaintiffs' claims are pre-empted under Section 259 is both procedurally improper and meritless. Procedurally, such a defense, like any other affirmative defense, is waived if not raised in the answer (which it was not). And aside from the general waiver rule in Fed. R. Civ. P. 8(c), Section 259 itself states that an employer must "plead and prove" its good faith reliance on a regulation or interpretation thereof. As Plaintiffs contend, by failing to raise this defense in their Answers or even a cross-motion for summary judgment and raising it only in an opposition to Plaintiffs' summary judgment motion, Defendants have waived that defense.

In any event, the defense is meritless. Under the applicable regulation, 29 C.F.R. § 790.19,[10] the finding of an individual DOL investigator cannot provide a Section 259 defense.[11] *See Cusumano v. Maquipan Int'l, Inc.*, 390 F. Supp. 2d 1216, 1222 (M.D. Fla. 2005); *see also McLaughlin v. Quan,* 1988 WL 62595 at *3 (D.Colo. June 17, 1988) (written finding by DOL investigator "would not constitute a ruling or interpretation of the Administrator such that any good faith reliance upon it would support a defense under 29 U.S.C. § 259").

[10] That regulation provides that "the regulations, orders, ruling, approvals, interpretations, administrative practices and enforcement policies relied upon and conformed with must be those of an agency and not of an individual officer or employee of the agency," even if the officer presents his or her findings or interpretations as being those of the agency. 29 C.F.R. § 790.19(b) (cleaned up).

[11] Plaintiffs also contend that Defendants have not established that they are entitled to a Section 259 defense because they purported to rely on the DOL investigator's *oral* findings regarding classification, which cannot form the basis of such a defense. However, Defendants produced a written report from the DOL investigation which notes a lack of overtime violations (which would likely follow from misclassification) and also expressly states that "we are not able to substantiate the findings of an employment relationship at this time." [Doc. No. 162-3].

Accordingly, both procedurally and on the merits, the Section 259 defense raised by Defendants does not preclude summary judgment for Plaintiffs on the misclassification issue.

C. Plaintiffs Are Entitled to Summary Judgment that Vladic Is Individually Liable

Plaintiffs contend that based on the undisputed facts, Defendant Vladic, DMV's sole owner and "chief," is individually liable under both the FLSA and the Virginia, D.C., and Maryland wage laws which are coextensive with the FLSA in this respect.[12] Under these laws, an "employer" is defined in relevant part as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). As with the employee versus independent contractor distinction, whether an individual qualifies as an employer subject to FLSA liability is determined according to the "economic realities" of the relationships between the various putative employers and their workers, especially on whether "the individual has sufficient operational control over the workers in question and the allegedly violative actions." *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 720 (E.D.N.C. 2009); *see also McFeeley v. Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260, 274 (D. Md. 2014). To this end, courts apply a totality of the circumstances test that includes such non-exhaustive factors as the putative-employer's job description; financial stake in the enterprise; power over hiring, firing, and wages; and duties or practices with respect to employee supervision, scheduling, and recordkeeping. *Id.; see also Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016).

The uncontroverted evidence with respect to each the above factors establishes as a matter of law that Defendant Vladic is a statutory "employer." DMV is a closely-held business with a small management team usually comprised of only five people ([Doc. No. 157-8] at 31); Vladic unilaterally makes all decisions with respect to hiring, firing, rate of pay, and independent

[12] The sole exception to individual liability, which Plaintiffs have already conceded, is with regard to their VWPA claim under Va. Code. Ann. § 40.1-29. *See* [Doc. No. 18].

contractor classification, [Doc. No. 91] ¶ 35; [Doc. No. 120] ¶ 35; [Doc. No. 157-8] at 37, 40–42; he authored the ICA and ICH and sets all company policies, [Doc. No. 157-8] at 85–88, 92; [Doc. No. 157-12] at 120; and he maintains all employment records, personally transcribing employees' reported hours in a payroll tracking spreadsheet and overseeing payments using a computer-based system called Gusto. [Doc. No. 157-8] at 154–55. And courts have found employer status under similar facts. *See, e.g.*, *Perez v. Ocean View Seafood Rest., Inc.*, 217 F. Supp. 3d 868, 878 (D.S.C. 2017) (determining rate and method of payment supports individual liability); *see also Ulin v. Alaea-72, Inc.*, 09-cv-3160, 2011 U.S. Dist. LEXIS 17468 at *33 (N.D. Cal. 2011) (determining and recording employees' hours supports individual liability).

Accordingly, based on the undisputed facts, Plaintiffs are entitled to judgment as a matter of law that Defendant Vladic is individually liable for each of their causes of action other than the alleged violation of the Virginia Wage Payment Act.[13]

## IV. CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 156] be, and the same hereby is, **GRANTED** as to Defendants' misclassification of the members of both the FLSA collective and the Rule 23 putative class, and also as to Defendant Vladic's individual liability; and it is further

**ORDERED** that Defendants' Motion for Decertification [Doc. No. 159] be, and the same hereby is, **DENIED**; and it is further

[13] Defendants do not address specifically Defendants' Vladic' individual liability, presumably relying on their 29 U.S.C. § 259 statutory immunity contention, and Plaintiffs' Motion as it regards this issue appears to be uncontested.

**ORDERED** that the telephonic Final Pretrial Conference in this matter, which was previously continued pending further order of the Court (*see* [Doc. No. 115]) is hereby **SCHEDULED** for Thursday, September 17, 2026 at 11:00 a.m.

The Clerk is directed to forward copies of this order to all counsel of record.

Anthony J. Trenga
Senior U.S. District Judge

Alexandria, Virginia
September 11, 2026